(*Circuit Court of Cook County. In Chancery.*)

# Illinois Manufacturers' Association, City of Chicago, et al.

## vs.

## Chicago Telephone Company.[1]

(January 7, 1902.)

1. TELEPHONE COMPANIES—RATES FOR TELEPHONE SERVICE. Where a municipal corporation grants to a telephone company the right to use the streets for the installation of its telephone service, and as a condition of such grant the telephone company agrees that it will not increase to its present or future subscribers' the rates for telephone service then established, it is the duty of such telephone company to comply with the terms of such ordinance and furnish the service agreed to be furnished at the rates fixed by the ordinance.

2. SAME—CHARACTER OF SERVICE—RATES. Nor is it material that an improved service is furnished to such subscribers, or that such improvements were not in existence at the date of the passage of the ordinance. Having adopted the improvements it is the duty of the company as a public service corporation to furnish telephone service with all such improvements at the rates fixed by the ordinance.

3. ORDINANCES—WHETHER PUBLIC LAWS OR PRIVATE CONTRACTS. Such an ordinance is not a mere private or business contract between the city and the telephone company, but is an exercise of the sovereign or governing power of the state delegated to the city by its charter.

4. ORDINANCES—PRACTICAL CONSTRUCTION—ESTOPPEL AND ACQUIESCENCE. There can be no estoppel against the enforcement of an ordinance which is a public law, by reason of any practical construction placed thereon by the parties or by acquiescence in such practical construction.

5. PAYMENT IN EXCESS OF RATE FIXED BY ORDINANCE—WHETHER VOLUNTARY. Where a public service corporation exacts charges in excess of those allowed by law, the payment of such charges is not regarded as voluntary, nor is the making of any protest or objection necessary in order to recover back such excess charges.

[1] The decision of Judge Tuley was affirmed by the appellate court on appeal. See 106 Ill. App. 54. See also *People ex rel. City of Chicago v. Chicago Telephone Co.*, 220 Ill. 238.—Ed.

Motion for preliminary injunction. Heard before Judge Murray F Tuley on bill, answer, documentary evidence and supporting affidavits. Gen. No. 221,614.

*Moran, Mayer & Meyer,* solicitors for complainants.

*Charles M. Walker,* corporation counsel for city of Chicago.

*Holt, Wheeler & Sidley* and *J. J. Herrick,* solicitors for defendant.

TULEY, J. :—

This is a bill filed by the Manufacturers' Association and a number of other lessees of, and subscribers for, telephone instruments, equipments, and service, carrying on various kinds of mercantile and other business in the city of Chicago, and on behalf of all others similarly situated, who are willing to become complainants and share the expenses of litigation, against the Chicago Telephone Company, an Illinois corporation, which, it is alleged, enjoys a practical monopoly of furnishing telephone service and operating telephone lines in said city.

The bill alleges the due passage by the city council of the city of Chicago of an ordinance on the 4th of January, 1889, granting to the defendant telephone company permission and authority to construct, maintain, repair and operate in the public streets, alleys, tunnels and public ways of the city, for a period of twenty years, lines of wires or electrical conductors for the transmission of sounds and signals, only by electricity and containing certain provisions as to the placing of wires underground in a certain specified district, and as to the erection of poles upon the streets in the remainder of the city, etc.; and among other things providing for the payment into the city treasury of 3 per cent, annually, of the gross receipts from the telephone business done in the city; and also that said company, during the term for which the ordinance was granted, "shall not increase to its present or future subscribers the rates for telephone service now established, and provided also that, with the acceptance hereinafter required, there shall be filed by said company a schedule showing the rates charged for telephone service at the date of the

passage of this ordinance, within the limits of the city of Chicago.''

This ordinance also provided for the filing of an acceptance with the city clerk, and a bond of $10,000 with the city of Chicago, within thirty days after the passage of the ordinance.

On January 8, 1889, the Telephone Company filed with the city clerk its acceptance of said ordinance and the bond required thereby.

The bill alleges that the company has obtained a monopoly of the telephone business in the city, and controls the telephone business between its lessees in the city, and also with persons over the long distance telephone, and sets forth at length the necessity of the telephone as an instrument of business.

The bill also alleges that on said January the 8th the company, in pursuance of said ordinance, filed with the clerk a map and schedule of rates charged by the company within certain limits and districts of the city shown upon said map, from which it appeared that within certain blue lines upon said map, which embraced the north division of the city south of North avenue (except Goose Island); and the west division east of Western avenue and south of West Division street and north of West Twenty-first street and the south branch of the Chicago river; and the south division, except the territory east of Clark street and south of Thirty-first street, and the forks of the south branch of the Chicago river—the Telephone Company furnished to all subscribers and lessees desiring a business connection, a telephone business connection at the rate of $125 per annum, and furnished residence telephones and service at the rate of $100 per annum.

The bill alleges that complainants are within said blue lines, and that notwithstanding its legal obligation and duty in that regard, the said company, after accepting said ordinance as set forth, commenced by various pretexts and pretenses to increase to persons taking telephones and service within said territory, the annual rental therefor, and required such persons to enter into a contract to lease, setting out the terms and conditions upon which telephones and service would be fur-

nished; and that, being unable to obtain telephone service except from defendant, and the same being indispensable to the proper conduct of their business and affairs, the complainants, respectively, were compelled to sign pretended contracts or leases by which they agreed severally to pay the defendant company $175 for business telephones, or $50 per annum more than the amount authorized to be charged by said ordinance; that this exaction of said excess of $50 per annum was beyond the power and authority of said Telephone Company and is against public policy, and that, under the circumstances, the agreement to pay such excess is not binding upon complainants, respectively.

The bill alleges that defendant pretends that the telephone apparatus and appliances and circuit, which it furnishes at said rate of $175, is a better and more efficient system and service than was in operation at the time of the passage of the ordinance; that while it may be true it is superior to that of 1889, it is because experience and invention have increased the efficiency of telephone instruments, conductors, wires and circuits; that the circuit in use at the passage of the ordinance was what is known as a "ground circuit," and that with the multiplication of electric wires and various conductors of electricity in the city of Chicago, the furnishing of telephone service over such a ground circuit became and is utterly impracticable, and metallic circuits had to be adopted and put in use by the Telephone Company in order to keep abreast with the progress in telephone service and appliances; and also because with any other than metallic circuits the telephone service would be insufficient and practically useless.

The bill alleges that the cost of furnishing an efficient service has been rather reduced than increased, and that while $125 per annum may have been at the period of the passage of the ordinance a reasonable rate, it is now very much in excess of a reasonable rate for such service, but offers to pay the same until by legal authority it may be reduced. The bill alleges that the company has compelled users of telephones for residence purposes to pay (illegally) $125 per annum, or $25 more than provided in said ordinance; and al-

leges threats made by the company to cut off telephone service if the alleged illegal exactions are not paid; that it was not until within the last few weeks before filing the bill that complainants became aware of the fact that the excess of $50 and $25 per annum, respectively, was an illegal exaction, and that the complainants had not since paid the same.

The bill prays for a decree that the rental provided by the agreements or leases exacted by the defendant from complainants, in so far as it exceeds $125 per annum, to-wit: Fifty dollars per annum may be decreed illegal and not binding, and that the defendant is bound to furnish telephones for business purposes, and with services such as are enjoyed by the complainants for and at the rate of $125 per annum; and for an injunction restraining the company from collecting any greater rental, and from refusing to furnish telephones and telephone service at the rate fixed in said ordinance upon any pretense or pretext whatever.

The answer of the defendant admits the allegations of the bill as to the passage of the ordinance and its acceptance; that it had no right to lay its conduits or occupy the streets, etc., of Chicago without the consent of the city, and that since its passage it has constructed and maintained its poles, wires, etc., in and under the streets, etc., of the city by virtue of the consent of the city contained in such ordinance.

The answer denies that it has obtained a monopoly of the telephone business, and sets out several ordinances passed in favor of other companies, and alleges that one of them, before the filing of the bill, had commenced the work of construction, and obtained contracts to furnish telephone service to different subscribers.

Admits it maintains and operates a telephone system, not only in Chicago, but also in various neighboring cities, towns, and villages in Cook and seven nearby counties of Illinois, and two in Indiana.

Alleges that it does not own the telephones used by it, but that they are leased and licensed to it by the owner.

Admits that its earnings are as stated in the bill, and that it pays a dividend on its stock of twelve per cent. per annum;

admits that under the ordinance it is bound to furnish telephone instruments connected by wire with its exchange at $125 per annum for business purposes, and $100 per annum for residences, but denies it was its duty to furnish to complainants or others "equipment, telephones and service agreed to be furnished and furnished under the special contract 'Exhibit B' to the bill of complaint."

Denies the alleged pretexts and pretenses for increasing its rates, and that complainants were compelled by it, in order to obtain telephone service, to sign the contracts or leases, "Exhibit B," for the payment of $175 per annum, but alleges the same were freely and voluntarily entered into by the complainants.

Denies that the said contracts or leases ("Exhibit B") are opposed to public policy, or in violation of the terms and conditions of the ordinance.

The answer describes the poles, wires and earth connections and circuit in 1889, and the instruments used, the magneto bell and hand generator, or small dynamo, used for connection with the signaling, the hand telephone and one transmitter called the "Blake" transmitter; alleges that such system, with some improvements, has been, and is still, furnished by the defendant to those desiring it, ever since the passage of the ordinance.

Alleges that the long distance telephone had not reached Chicago in 1889, and was then only in a comparative state of development, and after the date of the ordinance, it was gradually developed until communication could be had by it over one thousand miles of wire, and that in 1893 the American Telephone Company had extended its long distance telephone from New York to the city of Chicago; that such long distance system was wholly different from that in use by the defendant and other companies, which maintained local systems by means of grounded circuits and other equipments described as in use in 1889. That the long distance had a wholly different circuit, and required two wires instead of one, consisting of copper, and differently arranged.

Alleges that the entire equipment, connecting wires, hand

telephone transmitter, dynamo cells of battery, switch board, and its connected appliances were wholly different; that the local system and equipment of 1889 was sufficient for local exchange or toll service for a distance of forty to one hundred miles, and could not be used practically for communication over the long distance, by making connection with it, for over one hundred miles; that the American Telephone Company installed its exchange in the same room with the defendant's exchange, and placed long distance telephones in subscribers' places of business with necessary appliances, under a charge of $96 per annum; that the subscribers of defendant, who did not have long distance telephones, had to go to long distance toll stations; that thereupon a demand sprang up for telephone equipments, which the subscribers of defendant might use either for long distance business or for local service.

Alleges that subscribers could have the old service of 1889 improved, or the combined local and long distance, and that sometimes subscribers had both kinds.

The answer sets out at great length acts of the city of Chicago and of complainants, which it contends amounts to a practical construction of the ordinance of 1889, to-wit: that it, the defendant, had a right to make the special contracts and require the additional pay for the improved service.

That, relying upon the recognition of defendants' rights to make such special service and contracts, and the acquiescence of the city of Chicago and of the complainants and of the general public, it had from time to time expended large sums of money in order to enable it to provide such special service and equipments in accordance with such contracts.

The answer alleges that it has given to grounded line subscribers the most available inventions relating to telephone service by grounded lines and Blake transmitters; that it has removed poles from the streets and put wires under ground and laid cables containing copper wires in connection therewith at a vast expenditure.

That to enable defendant to meet this demand of the public, the defendant, in 1893, devised such instruments and equipments and made such arrangements with the American

Telephone Company as enabled it to furnish the combined service under which the defendant has furnished such service to complainants under the terms of such contract, agreeing, however, to guarantee to the American Telephone Company payment of all tolls for the use of its lines and to collect the same.

The answer sets out what was necessary to be done, the substitution of new instruments of greater power, of a complete metallic circuit instead of the ground circuit, the remodeling of its switch board, the new metallic trunk lines in place of the old, which were made noisy by induction, etc.

That it was at this time the special contract (''Exhibit B'') with complainants came into use and has continued in use since that date.

That in 1901 the defendant company was operating 36,000 telephones in the city of Chicago and the long distance had been extended to 26,000 cities, villages, etc., and subscribers of defendant, entering into this special contract, could reach all of these places; that defendant has relieved subscribers to the grounded line telephone from the turning of a crank or ringing of a bell, and from the interruption of defendant's employes for the purpose of restoring or inspecting the call battery located on subscriber's premises, by adopting and giving subscribers the benefit of the common battery system, and the answer sets forth in detail the advantages of such additions or improvements, including the substitution of copper wire in part and placing same in cables in conduits, by which interference by inductive disturbances caused by electric currents from electric lights, railway and telegraph wires were as to such copper wires as were in cables avoided.

That about 2,500 subscribers now use the grounded line system.

Defendant sets out several other forms of special contracts that it has devised by which subscribers can pay in proportion to the use desired or the number of messages transmitted or for each call or message sent, also for a two-party line and ten-party line, and that by most or all of which the subscriber may obtain competent service at a less rate than $125 per annum.

The answer sets up estoppel and acquiescence by reason of the recognition of defendant's right to make charge for the special service, etc., and prays the benefit of a demurrer to complainants' bill for want of equity, and also upon the ground of multifariousness and for improper joinder of parties complainant.

Without reviewing the evidence in detail, consisting of numerous affidavits and documentary proof, it is sufficient to say:

That it clearly appears that the grounded line telephone service, as it existed in 1889, gradually became more and more inefficient and unsatisfactory. This was caused by the introduction of wires for electric lighting and railway service, and the steadily increasing multiplication of iron pipes and conductors of electricity being placed in and over the streets and alleys of the city of Chicago.

Also that it is apparent from the evidence that the telephone service in existence at the passage of the ordinance for the causes aforesaid, demanded that some changes and improvements be made.

It became impracticable to continue the use of the iron wire and grounded circuit in the most central part of the city, and for that reason, among others, it became necessary to substitute in places the copper wire for the iron, and at certain points to have return trunk wires, so as to relieve the service from the many disturbances arising from the growth and the increasing use of the streets for public and *quasi*-public purposes, by other corporations and individuals.

The defendant's answer in connection with the evidence clearly shows the inadequacy and inefficiency of the old service for the changed condition of affairs.

The improvements which the answer alleges were made in the old grounded service by the defendant, and for which it appears the defendant made no extra charges to subscribers, must be held to have been made to advance its own interests as well as in the performance of its duty to give telephone service at the rate of $125 per annum.

The fact that it made no charges for such improvements in the grounded line circuit, must be taken as a recognition

of its duty and obligation to give an improved service and remedy defects in the then existing service when it was practicable to do so, and this without extra charge therefor. It was equally as strong a practical construction of the ordinance as the special contracts which were entered into after the passage of the ordinance in question.

All the improvements adopted in the service, under the special service contract ''Exhibit B'', except the long distance connection, are practically of the same nature as the improvements in the old or grounded line service, and no reason can be perceived why the improvements in the latter service should be made and given free of charge, and those of the former or special service should be made the subject of additional charges. They were all demanded by the necessities of the situation, the changed conditions, the growing inefficiency of the service, and were demanded not only to overcome new difficulties, but also to increase the demand for telephones.

It also clearly appears from the evidence that all these improvements in the service were not only demanded for the satisfactory service to subscribers, but also that they were made by the telephone company in its own financial interest and for its own advantage.

In my opinion, from the evidence, substantially all of these improvements in instruments and in improved service rendered by the company under the special contract, ''Exhibit B,'' would have been made had the long distance telephone never reached the city of Chicago.

It was well known at the time of the passage of the ordinance that copper was a much better conductor of electricity than iron, and that a return wire was much better than a grounded circuit; that a Blake transmitter was better than those that preceded it, and that improvements in telephones and telephone appliances were continually being sought for and discovered; that the art of telephoning was yet in its infancy, and that the future was rich in promise of its growth and improvement. The attention it was receiving from scientific experimenters, the history of the growth of the telegraph, of the railroad, of the steam engine and other great improve-

ments, all these matters must be held to be part of the "surrounding circumstances" under which the ordinance in question was passed and accepted, and which are to be considered in arriving at the intention of the parties.

That the grounded line service was steadily becoming more and more inefficient and unsatisfactory, and that the defendant found it to the interest of the company to encourage the demands for more efficient and satisfactory service is conclusively shown by the annual reports of the directors and official documents issued by the company, which have been introduced in evidence.

The annual report for 1899 contains a table showing that since 1893 the grounded line telephones in use by its subscribers decreased in the seven years, 1893 to 1900, from 8,983 to 3,843, an average annual decrease of thirty-nine per cent., while in the same period of time the metallic circuit (or improved service) increased from 1,131 telephones to 6,780, an average annual increase of sixty-four per cent.

The same annual report (1899) contains the following, which shows the cause of the large increase of the latter and the decrease of the grounded line: "Experience in all the telephone exchanges in large cities has *continued* to demonstrate the fact that *the best service cannot be* maintained and furnished over grounded lines. The interference from electric railways, electric power and lighting plants, and the inductive disturbances occasioned by long underground cable extensions, have made *this class of service* more and more difficult to maintain."

"The public needs demand not only the best quality of service, but that it shall extend to the most remote parts of the city."

In the annual report of the company for the year 1900, it is declared that "for a number of years the Chicago exchange (telephone service) was the largest at the time in the world. Its growth a few years later was seriously retarded by the troubles following the introduction of the trolley, and electric lighting currents throughout the city, which greatly interfered with the service upon the grounded lines, the only system then

in use. Since the more general adoption of *full copper metallic circuits,* by subscribers, the reliability of this service has been restored, and a *rapid growth of the exchange has followed.*"

"Opposition companies have made no material progress in our territory during the past year. * * * Of the ten opposition companies operating in the beginning of the year, five have entered into sub-license contracts, under which their systems are equipped with our standard apparatus, and may be used in connection with our general system."

In the defendant's telephone directory, issued in October, 1901, under the head of "General Information" as to how to use the telephone, report trouble, etc., occurs the following:

"On account of interference by currents from electric railways, lights, and other electric systems, *it is not possible* to insure satisfactory *communication by subscribers* having grounded exchange lines. The character of the service in such cases will depend largely upon the local interference encountered."

In its report for the year 1898, the company declares that "the (telephone) business is still to some extent in its experimental stage, but it is confidently believed that stage will soon be passed, and that when the various kinds of apparatus which are required shall become standard * * * a better service will become possible, and lower rates may prevail," etc.

In the face of this showing and admissions by the Telephone Company, it would be a forced construction, if any construction is necessary of the ordinance in question (which the company insists is a mere private contract between it and the city), to hold that the Telephone Company's only duty or obligation as to furnishing "telephone service" is to furnish the grounded line service in existence when the ordinance was passed.

I find no such provision in the ordinance (which could easily have been inserted had such been the understanding), nor do I find any provision or contract to furnish "an inefficient or unsatisfactory" telephone service.

Nor was the long distance telephone unknown by any means at the time of the passage of the ordinance in question. It was then known as an historic fact that Rysselberg and others had talked over a copper wire a distance of one thousand miles in length and the long distance was on its way from the east and was at or near Pittsburg at that time. The business world was alive as to its possibilities and that it must soon reach Chicago, must be assumed to have been known to the parties making the so-called contract by the ordinance in question.

The service of 1889 was not confined to the city of Chicago, but extended to many toll stations with which the defendant company was connected and to be connected.

By connecting the subscriber with an out of town toll station at a neighboring village, the subscribers could talk with a resident of a village over some other company's line, which furnished telephone service in that, or with some other, village, but the service over the other line was an extra charge on the subscriber. The relation of the parties to the long distance is precisely the same as existed in 1889 as to the out-of-the-city toll service. It is only one more toll station, or service, in addition to what the defendant company already possessed. It makes no difference that it was located in Chicago and not in one of the seven counties in which defendant had toll-station service. Why should such a connection cost $50 per year more than any new toll station since established in an adjoining county? The charges for the service rendered after the connection is made is paid in both instances by the subscriber using the connection.

The defendant alleges it made an arrangement with the American Telephone Company for such connection and combined service. It appears that this arrangement was made as early as 1891, more than a year before the long distance telephone arrived in Chicago, and it must be presumed that it was made by the company voluntarily and because it was for its advantage to make it; also that it took care of its own interests in arranging the terms of the agreement.

Indiana decisions cited by the complainants, when taken into consideration with the case of *People ex rel. v. The Sub-*

*urban Railway Company,* 178 Ill. 594, must be taken as clearly controlling the case at bar.

Upon the 13th of April, 1885, the legislature of Indiana passed an "Act to Regulate the Rental Allowed for the Use of Telephones," and fixing a penalty for its violation.

Section 1 of the act provided: "No individual * * * corporation, * * * owning * * * operating any telephone line in operation in this state, shall be allowed to charge * * * as rental for the use of such telephone, a sum exceeding $3.00 per month, where only one is rented."

One Haughey requested the Central Union Telephone Company, an Illinois corporation then operating in the state of Indiana, to extend its lines to his farm, and rent him one telephone. The company offered to rent him a hand telephone, a magneto bell, and to connect him with their exchange, and to furnish exchange service for certain hours of the day, for three dollars per month, reserving the right to put others on the same line. Haughey declined to accept this offer and entered into a contract with the Telephone Company for the use of one battery transmitter, one magneto telephone, and the necessary appliances for connecting them with the exchange, at sixteen and two-thirds dollars per month.

The items of charges were as follows:

Rental of one magneto telephone and one battery transmitter (two telephones) at the rate of $20.00 per annum. Labor and service charges for switching, construction, and maintenance charges for lines, batteries, central office supplies, magneto bell and appliances at the rate of $114.00.

An information was filed against the telephone company for violation of the statute; it was fined, and appealed to the supreme court.

That court, in language very applicable to the case at bar, after holding telephones to be a matter of public convenience and of public necessity, and an important and indispensable instrument of commerce, and that no other known device can supply the extraordinary facilities that it presents, holds that it is property devoted to a public use and a legitimate subject of legislative regulation and control.

The court, in its opinion, then describes the telephone in use when the act was passed—the Bell hand or magneto telephone in a hard rubber case, used in both transmitting and receiving sounds carried over a connecting wire. This with the magneto bell or call bell was all that was used at that time; then came the Blake transmitter, by which words were transmitted in a louder tone and with more effect than through the Bell hand telephone.

The Blake, though, was in use in 1885 by those who desired the best available services. Since it came into use the Bell hand telephone is used only as a receiver of messages.

It was contended on the part of the defendant that that act applied only where one telephone was used and not where two were—i. e., where the Blake transmitter and the hand telephone were both used.

The court says, "The word (telephone) constitutes a generic term, having reference generally to the art of telephony as an institution, but more particularly to the apparatus as an entirety, ordinarily used in the transmission, as well as in the reception, of telephonic messages;" that the proper meaning of the word was "an organized apparatus, an institution, and not a single instrument."

The judgment of the lower court imposing a fine for a violation of the law was affirmed. *Hockett v. State*, 105 Ind. 250.

In the case of *Central Union Telephone Co. v. Bradbury*, 106 Ind. 1, there was brought before the court another offer on the part of the Telephone Company to avoid the law in question, and the court again held that the act imposing certain duties on the Telephone Company, passed in April, 1885, was valid, and an act which required them to serve all without discrimination or partiality.

Bradbury applied to the Telephone Comapny for a telephone to be placed upon his business premises. The company replied that it had several grades of equipment or service. "If you want the hand telephone and magneto bell and service from 7 a. m. to 6 p. m., we will give it to you for $3.00 per month; or, if you wish another service, hand tele-

phone, $10; Blake transmitter, $10; for additional service and material furnished to you, $40 per annum." Bradbury applied by petition for *mandamus* to compel the company to furnish him the highest grade or class of telephonic service at $3 a month. The company answered that it could not furnish such service at $3 a month, but that it would furnish the other specified service at $3 per month, denying the power of the state to fix its rates and also denying that it was a common carrier of news.

The court referred to the former case in the 105th Indiana, and held it to be decisive of the case then presented and that the term "telephone," as defined in that decision, was to govern the company under the law, and awarded the *mandamus* asked for.

In *Johnson v. The State*, 113 Ind. 143, another device of the Telephone Company to evade the law was brought before the supreme court. The company undertook to impose a fixed charge of one dollar per month (in excess of the three dollars per month allowed by the statute) for non-subscribers using the telephone, which was to be charged and collected whether the telephone was or was not used by the non-subscribers and without regard to the number of such persons or the number of times that it might be used. The court held that this was a violation of the law.

It appeared in that case that the company undertook to divide its customers into six classes, charging three dollars per month to each class, and from fifty cents to two dollars additional for its use by non-subscribers, and Johnson was in class three.

The company then adopted another device for evading the law, which was brought before the supreme court, in the case of the *Central Union Telephone Company v. The State ex rel. Falley*, 118 Ind. 194.

The court held that the telephone was an instrument of commerce, and persons or corporations engaged therein are common carriers of news: that a corporation owning telephone lines, furnishing connection and facilities and service to persons * * * can be compelled by *mandamus* on pe-

tition of one discriminated against to furnish the same independent of any statutory provision against discrimination, and that it was no answer to a refusal to furnish the same to say that by furnishing him with one instrument and service, he would be placed in communication with persons outside of the state. It appears that the company had ceased doing any rental business and had adopted the toll station system in the city of Lafayette. This toll station system was connected with a telephonic system inside and outside of the city. The court held that the Telephone Company could not, directly or indirectly, take a greater rate than they might by ordinance; that the petitioner asked only for telephone service at her place of business for city purposes, and it was no answer to say that she could also connect with parties outside of the state if the telephone was placed in her place of business.

In the case of the *Chesapeake & Potomac Telephone Company v. Baltimore & Ohio Telephone Company,* 66 Md. 399, 7 Atl. 809, the company there endeavored to set up an agreement under which it was allowed to operate a telephone, that it would not receive telegraphic dispatches from a certain company. The court held the agreement in that regard void, holding that the duty of transmitting, by law, was paramount to that prescribed by the contract.

The Indiana supreme court properly held that a telephone company by no special device or pretense of improved, better or different appliances or service, could evade its duty to rent telephones and give telephone service at the rate prescribed by the statute; that the limitation of the law was not as to the telephone service in force at the time of its passage, but applied to all the telephone service at any time thereafter that the same might be furnished to subscribers.

The reasoning of the court and the principles declared in the Indiana cases are directly in point in the case at bar, and should control it, unless there is some vital difference between the limitation by legislative act and one imposed by ordinance accepted by the defendant.

The defendant contends that there is this vital distinction,

because one was the act of the legislature in the exercise of the sovereignty of the state, it was an act of the governing power, while the ordinance in question in this case was a contract and not a law; that such ordinances are not the exercise of the governing power, but of the business or private powers of the corporation.

The defendant properly contends that ordinances have a double character—governmental or public—by virtue of being made the instrument of the state to govern the particular locality, the other proprietary, or private, and that in the exercise of the latter power it is, *quo ad hoc,* a private corporation. Upon this point the learned solicitors of defendant cite several decisions of the United States courts and others, several of which refer to contracts between a municipality and a corporation to supply the people of the municipality with water.

The court has carefully considered the cases cited, but will not attempt to review them, believing them to have but little bearing upon the question here involved, when the decisions of our own supreme court are taken into consideration, which latter decisions must govern.

It is admitted that the defendant Telephone Company is a public service corporation, and analogous in many respects to that of a common carrier; that it must treat all its patrons alike and without discrimination.

In that respect it must also be held to resemble a street railway corporation, and an ordinance granting to a street railway corporation the privilege of using the streets of the city for street railway purposes on condition that it should charge not to exceed a certain rate of fare would be exactly similar in principle to the ordinance in question granting the telephone company the use of the streets, etc., on condition it should not increase its rates for telephone service above a certain amount. The two ordinances are passed in the exercise of the same power of the municipality. If one is the exercise of the governing power so is the other. If one is a private business contract so is the other.

Our supreme court, in a wide-reaching decision, has put this question at rest so far as this state is concerned.

The village of River Forest, in this county, is organized under the same act as the city of Chicago, to-wit: the general incorporation act for cities and villages, passed in 1872. It has the same power as the city of Chicago to lay out and improve streets and this general power "*to regulate the use of the same.*"

The village of River Forest passed an ordinance in due form granting the privilege to the Suburban Railway Company, an Illinois corporation, to construct, maintain, etc., its poles and tracks in the streets of the village upon certain conditions, among others that the rate of fare for the transportation of passengers from River Forest to Chicago should not exceed the rate of fare charged passengers for like service from any other stopping place within a certain part of the town of Cicero. The company undertook to discriminate in fares against residents of River Forest; information for a *mandamus* in the name of the people on the relation of one of its citizens was commenced.

It was contended, among other things, by the Suburban Railway Company, that the ordinance was a mere private contract and that *mandamus* would not lie to enforce a mere private contract; in other words, a contract made under the business powers of the corporation.

In a very able opinion by Justice Boggs the question as to the power of the village, and as to the nature of the power exercised by the village in passing the ordinance, whether governmental or not, was discussed. The case is found in *The People ex rel. Thomas M. Jackson v. The Suburban Railway Company,* 178 Ill. 594.

It was there held that a street railway company was not a private corporation, but a *quasi*-public corporation, and that "the power possessed by the state to attach, as a condition to the grant of a franchise to a *quasi*-public corporation, the performance of duties beneficial to the public, may be exercised by a municipality under its powers to grant to such corporation the use of its streets."

Also, "The fact that a street railway obtains its charter under the state laws does not make the authority given it by a municipality to use streets and alleys a mere license as the

charter merely gives the company its existence, and it cannot carry out the purpose of its existence without further exercise of sovereign power which has been delegated to municipalities with respect to their streets.   *   *   *

"A street railway company is not a private, but a *quasi*-public corporation, and owes it as a duty to the public to demand only reasonable fares for the transportation of passengers and to serve the public without unjust discrimination, and the performance of such duty may be secured to the public by the state acting directly or through a municipality.

"A village, on granting a suburban street railway company the right to use its streets, may prescribe as a condition that the fare between the village and points in the city shall not exceed that charged patrons from another town on the line; and the acceptance of the ordinance and the enjoyment of its benefits estop the company to deny that the exaction of a greater amount is not unjust discrimination." And that after it has enjoyed the benefit of the ordinance, the company was itself estopped to question the power of the city; that the company could not escape the performance of its undertakings by alleging that the ordinance was *ultra vires* the municipality and the company.

The court also held that "the right given by a municipality to a street railway company to use its streets is sufficient consideration for the undertakings of the company to comply with the conditions of the ordinance respecting charge for transportation.

"That being established," says the court, "compliance with the provisions of the ordinance in the respect named becomes a duty to the public, the performance whereof is within the right and power of the village, acting as the agency of the state, to secure, by means of the conditions incorporated in the ordinance. The fact that the ordinance required the company should formally accept it as conditioned had no effect to render the grant a mere private contract. The state, through the village, as its representative, was acting, and the power which was exercised by the village was that of the sovereign. That which the ordinance required the company

should do, and should consent to do, did not become mere contract obligations on the part of the company to perform acts beneficial to the village.''

The court cites in this opinion, with approval, the case of *Rogers Park Water Company v. Fergus*, page 571, of the same volume.

The contention that the passage of the ordinance in question was not the exercise of the sovereign or governing power of the state, delegated to the city of Chicago by its charter, but was a mere private or business contract of the city, not being tenable under the decisions of our supreme court referred to, it is deemed unnecessary to review the defendant's contention founded thereon, as to estoppel by the practical construction placed upon the ordinance, and the acquiescence, in such practical construction, by the city of Chicago, and the complainants, and the public generally.

Under the decisions quoted, it became the duty of the defendant as a *quasi*-public service corporation, by reason of the passage of the ordinance and its acceptance and enjoyment of the privileges conferred thereby, to furnish telephone service with all the improvements thereon to its subscribers at the ordinance rate of $125 per annum, and no acts or acquiescence of its subscribers by signing and accepting telephone service under the special contract, ''Exhibit B,'' can be held to be an estoppel upon such subscribers or to confer upon defendant a power which it has assumed to exercise in direct violation of the ordinance.

As held by the supreme court in the Suburban Railway Company case *ante,* the state might have provided in the charter of the defendant corporation (or by general law) that it should not charge to exceed $125 per annum for telephone service, but instead of doing so, the state merely authorized the company to perform telephonic service within the state. It has delegated to the city of Chicago the power to regulate the use of its streets, and it is distinctly held in the case cited that under that power the state had delegated to the city the power to grant the use of its streets to the defendant, and as a condition annexed to said grant, that it should not charge

to exceed a certain rate for telephonic service while it occupied the streets of the city under such ordinances; that such power exercised by the city was the sovereign or governing power of the state delegated to the city under the charter provision giving it the right to regulate the use of the streets; also that an ordinance of this nature is not a mere private contract, but that it is the exercise of the governing power of the state; that it became the duty and obligation of a *quasi*-public corporation like the defendant, exercising powers under such an ordinance, to comply with the same and furnish the service agreed to be furnished at the rate fixed by the ordinance, which rate by the consent of the city and of the defendant was determined to be a reasonable rate for the service to be performed.

Not being a private contract or a contract separate and apart from the exercise of the governing power of the city, the doctrine of practical construction and acquiescence contended for by the defendant can have no application, because as a public service corporation it was bound to give telephonic service at the rate fixed by the ordinance. When a subscriber cannot obtain satisfactory service except by entering into a contract by which he agrees to pay a greater rate than that fixed by the ordinance, the rate agreed to be paid, so far as it is in excess of the rate prescribed by the ordinance, must be held to be an illegal exaction, and not only illegal but forced, a forced agreement, by the company exacted of the subscriber, and not a voluntary contract which would estop him from disputing the same.

In the language of the Iowa supreme court, where a public service corporation exacts greater charges than is authorized by the law, the payment of such charges is not regarded as voluntary, nor is the making of any protest or objection necessary in order to recover back the excessive charges.

"The law does not require objection or protest to be made to the payment of unjust charges, for the reason that it would be in vain, being addressed to those who occupy the commanding power to enforce obedience to their requirements." *Heiserman v. Burlington, C. R. & N. R. Ry. Co.,* 63 Iowa, 732, 18 N. W. 903.

There is no contest made by the complainants as to the rights of the company to charge extra for what is called extension service.

With that exception the service rendered under the special contract, "Exhibit B," in question, must be rendered by the defendant at the ordinance rate, $125 per annum.

An order may be prepared in accordance with the views here expressed for a preliminary injunction as prayed for in the bill—upon the complainants, or some of them, entering into a bond to be approved by the court, in the penal sum of ———, conditioned, as provided by law.

The following is the injunction order as entered:

This day there comes on to be heard the motion for an injunction on behalf of the following named complainants and co-complainants:  *  *  *

Said motion comes on to be heard upon the sworn bill of complaint herein and the exhibits thereto attached, upon the sworn intervening petition of said co-complainants, upon the affidavits and documentary evidence offered and read in support of said bill and intervening petition, upon the affidavits offered and read by said defendant, among which were the sworn answers to said bill and intervening petition, which sworn answers were used as affidavits by said defendant; and the court having considered said bill, intervening petition and all said affidavits and documentary evidence, and said motion for an injunction having been argued by Messrs. Moran, Mayer & Meyer, solicitors for said complainants and co-complainants, and by Messrs. John J. Herrick and Holt, Wheeler & Sidley, solicitors for said defendant, and the court having duly considered the matter and being fully advised in the premises, doth find that said named complainants and co-complainants respectively, are entitled, until the final hearing of this cause, to an injunction as prayed in said bill and in said intervening petition.

Wherefore, the premises considered, it is hereby ordered, adjudged and decreed, that until the final hearing of this cause, the said defendant, Chicago Telephone Company, its

officers, attorneys, agents and servants shall be, and they are hereby enjoined and restrained, as prayed in said bill and in said intervening petitions, as follows:

1st. From removing or attempting to remove or from displacing or attempting to displace any of the telephone instruments and appliances, with copper metallic circuits, referred to in said bill of complaint and in said intervening petition, and now in the respective places of business of said named complainants and co-complainants as described in said bill of complaint and in said intervening petition; and from in any manner interfering with or interrupting said telephones, appliances and copper metallic circuits, and from cutting off or interrupting the circuits connecting the said places of business of said complainants and co-complainants respectively, with the exchanges or switches of said Chicago Telephone Company, and from refusing to continue to supply the present telephone service as now rendered to said complainants and co-complainants respectively, as described in said bill of complaint and in said intervening petition. This order is entered upon the condition that so long as it shall remain in force the said complainants and co-complainants respectively, shall pay or offer to pay to said Chicago Telephone Company at the rate of one hundred and twenty-five dollars ($125.00) per annum for each telephone instrument connected by copper metallic circuit with the exchange of said defendant for the business use of said complainants and co-complainants respectively and their respective employes, and that such payment or offer to pay shall be made at the times and in the manner specified in the respective contracts (a copy of which is attached to said bill of complaint and marked "Exhibit B"), and that said complainants and co-complainants respectively comply with all of the other provisions of such contracts, except the provision therein contained requiring the payment of one hundred and seventy-five ($175.00) dollars per annum for each such telephone instrument and appliance and connected by copper metallic circuit with the exchange of said defendant, and for such telephone service.

Nothing in this order contained is meant to limit or restrict

said defendant from exercising all rights and privileges in said contracts provided, except that said defendant shall not have the right to exact from said complainants and co-complainants respectively, a sum in excess of one hundred and twenty-five ($125.00) dollars per annum for each such telephone, telephone appliance, copper metallic circuit and telephone service for the business use of said complainants and co-complainants respectively, and their respective employes. The receipt by the defendant of payment at the rate of one hundred and twenty-five ($125.00) dollars per annum shall not prejudice its claim in respect to the $50.00 in dispute. Nothing in this order contained shall effect the price to be paid for so-called extension sets.

2nd. That all other persons, firms and corporations similarly situated with said complainants and co-complainants respectively, and whose respective places of business (in which such telephone instruments and appliances and copper metallic circuits for business use are located), are situated in the territory inside of the blue lines referred to in said bill of complaint and shown upon "Exhibit A" to said bill, being the territory within the city of Chicago, bounded by Lake Michigan on the east and a line running from the lake west on North avenue to the river; then down the channel east of Goose island to Chicago avenue; then up the river channel to Division street; west on Division street to Western avenue; south on Western avenue to 21st street; east on 21st street to Ashland avenue; southeast from Ashland avenue to the corner of 31st street and the river; east on 31st street to railroad tracks east of LaSalle street; south on railroad tracks to 39th street; east on 39th street to Lake Michigan; may, upon proper application to this court from time to time, become parties co-complainant to said bill of complaint by an appropriate order of the court to be entered from time to time in this cause for such purpose, and (unless in such order or orders it is otherwise provided) as soon and as often as such order or orders are entered herein, the injunction hereby granted shall *ex proprio vigore* extend to and in behalf of and apply to and be in force for the protection of such other par-

ties with the same force and effect and upon the same conditions herein contained, as though such other parties had been specifically named in this order.

3rd.   That this order shall take effect upon the filing by said Illinois Manufacturers' Association, or any other one or more of said complainants or co-complainants, of a bond in the penal sum of ten thousand dollars, upon such condition and with such surety as may be approved by the court.   And the defendant is allowed thirty days within which to prepare and file a certificate of evidence.   Thereupon the defendant prays an appeal from the foregoing order to the appellate court in and for the 1st district of Illinois, which is allowed upon defendant giving bond as provided by law in the penal sum of three hundred dollars ($300.00).

Enter    M. F. TULEY.[1]

NOTE.

RECOVERY OF EXCESS PAYMENTS EXACTED BY CARRIERS AND OTHER PUBLIC SERVICE CORPORATIONS IN EXCESS OF LEGAL RATE.

A. Where a public service corporation exacts charges greater than permitted by law, as the parties do not stand upon an equal footing, the payment of such charges is, as a matter of law, involuntary, and the excess may be recovered back.   There are but two essentials to a recovery, viz.: The illegality of the charge and the unequal footing of the parties.   The doctrine of voluntary payments as applied in cases between private individuals has no application.

In *Louisville, etc. R. R. Co. v. Wilson*, 132 Ind. 517, 32 N. E. 311, it was said that the decided weight of authority is to the effect that the payment of an overcharge of freight to a railroad company is not a voluntary payment within the meaning of that term, and that there was but little conflict in the authorities upon the proposition. The Indiana case was cited with approval in *News Publishing Co. v. Associated Press*, 114 Ill. App. 241, where a recovery was allowed of certain excessive and discriminating charges made to obtain news service.

In *Parker v. Great Western Ry. Co.*, 7 M. & Gr. 253 (a leading case), a recovery was allowed where the carrier had exacted charges in excess of a legal rate.   The court said: "We are of opinion that the payments were not voluntary.   They were made in order to in-

---

[1] Upon the death of Judge Tuley the above case was assigned to Hon. Julian W. Mack, and is now on final hearing before that judge.

duce the company to do that which they were bound to do without them; and for the refusal to do which an action on the case might have been maintained."

In *Swift v. United States*, 111 U. S. 22, the authorities are reviewed. There the claimant was entitled to certain commissions on the purchase of internal revenue stamps required in the sale of matches. The commissioner of internal revenue adopted a rule which required such purchasers to take their commissions in stamps instead of in cash, as they were entitled. These transactions occurred from 1870 to 1878. Prior to 1866 the leading manufacturers of matches, among whom was W. H. Swift, one of the stockholders and treasurer of the claimant corporation, made repeated protests to the internal revenue officers in relation to the ruling, but no protest was made on behalf of the plaintiff corporation. The court held that claimant could recover. The court referred to *Parker v. Great Western Ry. Co.*, *supra*, and said that in that case: "The wholesome principle was recognized that payments made to a common carrier to induce it to do what by law, without them, it was bound to do, were not voluntary, and might be recovered back."

In *McGregor v. Erie Railway*, 35 N. J. L. 89, an action was brought by a shipper to recover from the defendant carrier monies exacted for the carriage of freight in excess of the rates fixed in the company's charter. The court held that inasmuch as the parties were not on an equal footing that the payment could not be considered as voluntary, and a recovery was allowed. The court said: "Where a corporation or person has the power to refuse a right to which a party is entitled, unless he complies with an unjust demand, they do not stand on an equal footing. The courts will not be illiberal in allowing a person to act upon his reasonable apprehension of such refusal, when the circumstances fairly show that unless he does submit to the illegal demand, his rights will be withheld."

In *Peters v. Railroad Co.*, 42 Ohio St. 275, a recovery was allowed where the defendant exacted freight charges in excess of the rate fixed by law. The payments in question were made after the services were rendered.

In *Directors of Great Western Ry. Co. v. Sutton*, L. R. 4 Eng. & Irish App. Cas. 226, it was held that excess payments made to a carrier to induce him to perform his duty might be recovered back.

In *Great Southern & Western Ry. Co. v. Robertson*, 2 L. R. Ireland, 548, the same doctrine was announced. The court said: "When a man pays more than he is bound to do for the performance of a duty which the law says is owed to him for nothing, or for less than he has paid, there is a compulsion in respect of which he is entitled to recover the excess by action for money had and received."

In *Heiserman v. Burlington, C., R. & N. Ry. Co.*, 63 Iowa, 732, 18

N. W. 903, plaintiff sued to recover monies paid for the carriage of freight in excess of the rate fixed by statute. The court held that protest was not essential to a recovery for the reason that those who deal with public carriers are in their power and must bow to the "rod of authority" which they hold over their customers. The case is a well considered one.

In *Indiana, etc. Gas Co. v. Anthony*, 26 Ind. App. 307, 58 N. E. 868, an action was brought to recover back certain excess charges for gas, paid through fear that the supply would be cut off. The court said: "If appellee paid the excessive rate as a matter of necessity to obtain what he was justly entitled to, he may recover it back, although he knew at the time of the payment that the demand was unjust. If appellant had the right to turn off the gas unless appellee complied with its demands, the parties were not treating upon equal terms." There was, however, no actual threat to turn off the gas.

In *Beckwith v. Frisbie*, 32 Vt. 559, it was held that where the parties do not stand upon an equal footing the payment is not voluntary.

· In *Capital Gas & Electric Light Co. v. Gaines*, 49 S. W. 462, 20 Ky. Law Rep. 1464, the gas company procured an ordinance requiring it "to supply consumers of gas at the rate of not exceeding $2 per thousand cubic feet." The company, and the city before it, had for more than twenty years been in the habit of charging and consumers were accustomed to pay, in addition for the charge for gas, a meter rent at the rate of twenty-five cents per month. Complainant sued to recover the meter rents paid by him. The court said: "Appellee is entitled to recover such sums as he paid for meter rent for the five years preceding the filing of his pleading in which he asserts his claim. If the appellant was not entitled to collect meter rent under the terms of the contract, then honor and good conscience required it to be returned although the payment was voluntarily made."

The principle in question is thus laid down in 2 Page, Contracts (1905), sec. 810: "Payments made by one who is not on terms of practical equality with the person to whom such payments are made are looked upon, not as voluntary payments, but as payments made under compulsion." And in the same section it is said that "A common carrier and shipper do not stand upon terms of equality."

In *Railroad Company v. Lockwood*, 17 Wall. 357, 379, it is said: "The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle or stand out and seek redress in the courts."

In *County of La Salle v. Simmons*, 10 Ill. 513, the defendants, who were county commissioners, gave notice in 1837 that they would grant a license for a ferry across the Illinois river to the person that would donate the largest sum of money to the county. Up to that time the plaintiff had kept the ferry and was an applicant for a

license to continue the same. Several offers were made for the franchise, and the plaintiff bid the sum of $500. It was held that the payment could be recovered back, as it was coerced through an undue advantage taken of the plaintiff's situation.

In *Prickett v. Madison County*, 14 Ill. App. 454, a controversy arose out of a transaction in which the county of Madison issued certain bonds and exchanged them for old ones. The plaintiff, who was chairman of the board of supervisors, insisted that he had passed over to the county treasurer bonds to the amount of $303,000, while the treasurer insisted that he had received no more than the receipts held by plaintiff called for, namely, $301,000. The matter was made the subject of investigation by the board, and plaintiff, being unable to produce receipts for more than $301,000, and the board demanding that the deficit should be made good, the plaintiff, having nothing but his own memorandum to sustain him, finally paid the amount in dispute to the county. Subsequently he found the missing receipt, and brought his action to recover back the money. A recovery was allowed.

In *Chicago & Alton R. R. Co. v. Chicago, Vermillion & Wilmington Coal Co.*, 79 Ill. 121, certain individuals constructed a railroad extending from a coal mine belonging to the plaintiff to a station on the Illinois Central Railroad. The road in question was conveyed to the defendant. The original parties had previously made a contract that the railroad company should carry coal from the plaintiff's mine to the I. C. R. R. at $3 per car. The defendant company, for a time, carried coal for the plaintiff under the contract at that price, but thereafter it exacted $9 per car. The plaintiff brought suit to recover the excess. The court said: "It can hardly be said these enhanced charges were voluntarily paid by appellees. It was a case of 'life or death' with them, as they had no other means of conveying their coal to the markets offered by the Illinois Central, and were bound to accede to any terms appellant might impose. They were under a sort of moral duress, by submitting to which appellants have received money from them which, in equity and good conscience, they ought not to retain."

In *Mobile, etc. Ry. Co. v. Steiner*, 61 Ala. 559, an action was brought to recover charges exacted in excess of statutory rates on freights. The defendant had shipped large quantities of goods, and the defendant had compelled them to pay the excess charges. The court held that a recovery could be had, saying: "Railroads have so expedited and cheapened travel and transportation; have so driven from their domain all competing modes of transportation, that the public is left no discretion but to employ them, or suffer irreparable injury in this age of steam and electricity. They have their established rates of charges, and these the shipper must pay, or forego their facilities and benefits. To object or protest would be an idle

waste of words. The law looks to the substance of things, and does not require useless forms or ceremonies. The corporation and the shipper are in no sense on equal terms, and money thus paid to obtain a necessary service is not voluntarily paid, as the law interprets that phrase."

In *Baker v. City*, 11 Ohio St. 534, the plaintiff, a proprietor of a theatre, applied to the mayor for a license. The mayor demanded the sum of $63.50 in addition to the expense of issuing the license, as a condition precedent to its issuance. Fearing prosecution for violating the ordinances of the city by giving performances without a license, the plaintiff paid the amount demanded, under protest, and then brought his action to recover the same. The court allowed a recovery, saying: "These cases show that money may be properly held to have been paid involuntarily, or under coercion, where the position or interests of a party were such as to require from another the performance of a duty enjoined by law, and he was illegally compelled to pay the money to induce such performance. Undue advantage is not to be taken of the party's situation."

In *Smith v. Cuff*, 6 M. & S. 160, defendant refused to enter into a composition agreement to enable plaintiff to procure a discharge from bankruptcy unless plaintiff gave defendant notes for the balance of defendant's claim against plaintiff. Upon receiving the notes defendant sold the same, and plaintiff, having been required to make payment thereof, sued his creditor to recover back the amount paid. The court affirmed a judgment in plaintiff's favor. Lord Mansfield, C. J., said: "There was an inequality of situation between these parties; one was creditor, the other debtor, who was driven to comply with the terms which the former chose to enforce."

In *Atkinson v. Denby*, 6 H. & N. 778, in a similar case, Baron Pollock placed the right of recovery not only on the ground that defendant's action was a fraud on plaintiff's other creditors, but also on the ground that the payment could not be regarded as having been voluntarily made.

In 1 Wharton, Contracts (1882), sec. 149, after speaking of the common-law rule respecting duress, it is said: "Nor is the principle confined to payments made to recover goods; it applies equally well when money is extorted as a condition to the exercise by the party of any other legal right."

In Leake, Contracts (4th ed. 1902), pp. 61, 62, it is said: "Money extorted by a person for doing what he is legally bound to do without payment, or for a duty which he fails to perform, may be recovered back. * * * Upon this principle where a common carrier refuses to carry goods tendered for carriage, or to deliver goods carried unless paid an excessive charge, the owner of the goods being willing to pay what is justly due, but obliged to pay the full amount charged,

may recover back the excess as money received to his use." Wald's Pollock, Contracts (3rd ed.), p. 731, is to the same effect.

Keener, Quasi Contracts, pp. 426, 437, 438, says that plaintiff may recover money paid "to induce the defendant to discharge a duty." Addison, Contracts (9th ed.), pp. 431, 434, says: "Money improperly received and wrongfully detained. * * * The action upon such implied promise lies moreover against all persons who extort money for doing what they are by law bound to do without payment or reward, and who take or wrongfully detain the money of another; 'for,' as it has been justly observed, 'no man will venture to take if he knows that he is liable to refund.'"

In *Hooper v. Mayor*, 56 L. J., Q. B. 457, where harbor dues were charged in excess of the statute, Lord Chief Justice Coleridge said: "Where one exacts money from another and it turns out that, although acquiesced in for years, such exaction is illegal, the money may be recovered as money had and received, since such payment could not be considered as voluntary so as to preclude its recovery."

In *Morgan v. Palmer*, 2 B. & C. 729; S. C., 4 Dowl. & Ry. 283, a mayor overcharged for a publican's license. The court held that the defendant was not entitled to take any such fee, even though it had been immemorially paid for sixty-five years. Holroyd, J., said (p. 737): "I think that the money may be recovered in this action, and that it does not fall within that class of cases which apply to voluntary payments."

In *Transportation Co. v. Sweetzer*, 25 W. Va. 434, a recovery was allowed of excess freight charges. The case contains a thorough review of the authorities, which are reviewed at length in a masterly manner.

In *City v. Northwestern Mutual Life Ins. Co.*, 218 Ill. 40, it was held that a purchaser of property who pays to the city back water taxes owing by former owners of the property, which payment is made to prevent the city carrying out its threat to shut off the water, can recover back such taxes.

In *Hilton Lumber Co. v. Atlantic Coast Line R. Co.* (N. C.), 53 S. E. 823, it was held that where a higher charge was paid by the plaintiff than that charged other shippers, the payment is not voluntary, and the excess can be recovered back. The court said: "The authorities are uniform upon this question." This same conclusion is arrived at in *Salt River Valley Canal Co. v. Nelssen* (Ariz.), 85 Pac. 117.

In *Ratterman v. Express Co.*, 49 Ohio St. 608, it was held that the payment of an illegal tax on gross receipts of an express company under protest, and with notice of an intention to bring an action to recover back the same, is not a voluntary payment when made to avoid destruction of the company's business.

In *Harmony v. Bingham*, 12 N. Y. 99, it was held that where a

carrier, having in his possession a large amount of merchandise, exacted for freight more than was due, and the owner in order to obtain possession of the property paid the amount under protest, it was not a voluntary payment. In *Bank v. Watkins*, 21 Mich. 483, a payment of an illegal demand (a tax) to a public officer under protest was held to be involuntary. In *McKee v. Campbell*, 27 Mich. 497, it was held that payment to an officer under legal process is not voluntary, although no levy is made. In *Insurance Co. v. Herriott*, 109 Iowa, 606, 80 N. W. 665, payment by a foreign corporation of a license tax under an unconstitutional law made to protect the company's property interests is not voluntary.

In *Howe v. State*, 53 Miss. 57, it was held that the allowance by the board of supervisors of a county of excessive and illegal commissions to the county treasurer, and the approval by the board of his accounts, showing on their face that he had retained said sums, is not such a voluntary payment by the board as to prevent the recovery, by a suit on his official bond, of the amounts so retained.

In *Westlake v. City*, 77 Mo. 47, it was held that the payment of a water license under threat of turning off the water in case of continued refusal, is payment under compulsion, and if the charge is excessive the excess may be recovered.

In *State v. Nelson*, 41 Minn. 25, it is held that where a person is unable to place on record a deed of conveyance by which he has acquired title to real estate, by reason of illegal taxes being charged upon the land, he may pay such taxes, in order to secure the recording of his deed, without such payment being deemed voluntary."

In *Joannin v. Ogilvie*, 49 Minn. 564, 52 N. W. 217, it was held that where a party filed a mechanic's lien against property upon an unfounded claim, which the owner paid under protest in order to clear the title of record so that he might consummate a loan upon the property which he had negotiated in order to raise money to pay a prior overdue mortgage and other pressing debts, he having no other available means of raising the money, such payment was made under duress. This case contains a full review of the authorities, and shows the expansion of the common-law doctrine. To the same effect, see *City of Chicago v. Klinkert*, 94 Ill. App. 524; *Galesburg, etc. Ry. Co. v. West*, 108 Ill. App. 504; *City v. Waukesha Brewing Co.*, 97 Ill. App. 583; *City v. Sperbeck*, 69 Ill. App. 562; *Stephan v. Daniels*, 27 Ohio St. 527; *Pingree v. Mutual Gas Co.*, 107 Mich. 156, 65 N. W. 6; *Moses v. MacFerlan*, 2 Burr. 1005; *Bruner v. Town of Stanton*, 102 Ky. 459, 43 S. W. 411; *Guetzkow v. Breese*, 96 Wis. 591, 72 N. W. 45; *Carew v. Rutherford*, 106 Mass. 1; *Brewing Co. v. City*, 140 Mo. 419, 37 S. W. 525; *Railroad Co. v. Wolcott* (Ind.) 39 N. E. 451; *Railroad Co. v. Pattison*, 41 Ind. 312; *Panton v. Water Co.*, 50 Minn. 175, 52 N. W. 527; 2 Rapalje & Mack's Digest of Railway Law, pp. 628 *et seq.; N. Y. Cons. Card Co. v. United States*, 20 Ct. of Cl. 174; *Rip-*

*ley v. Gelston*, 9 Johns. 201; Redfield, Railways (6th ed.), sec. 124; 1 Wood, Railways, sec. 206; *Higley v. Railway Co.*, 68 N. W. 829; *S. C.*, 99 Iowa, 503 (holds protest immaterial); *Oates v. Hudson*, 6 Exch. 346 (money paid to obtain possession of deed recovered. See note at end of case); *Hancock v. Town of Dartmouth*, 2 Nova Scotia L. R. 120 (money paid for peddlers' license recovered back. Follows *Morgan v. Palmer*, 2 B. & C. 562); *Little v. The Dundas & W. M. Road Co.*, 2 U. P. C. P. 399 (tolls paid in order to enjoy a road are compulsory. Follows *Parker v. Railway Co.*, 7 M. & G. 253); *Hooker v. Gurnett*, 16 U. C. Q. B. 180 (fees exacted by clerk held recoverable. Following *Morgan v. Palmer* and *Dew v. Parsons*); *Corporation v. Sheriff*, 19 U. C. Q. B. 178 (sheriff's mileage fees held recoverable. Follows *Steele v. Williams* and *Dew v. Parsons*); 1 Story, Contracts (5th ed.) secs. 520 *et seq.* (money paid under compulsion may be recovered); *Tenbrook v. City*, 7 Phila. 105 (water rates paid under compulsion held recoverable); *Corporation v. Poussett*, 21 U. C. Q. B. 472 (illegal fees exacted by clerk held recoverable. Following *Steele v. Williams*, 8 Exch. 625); *Stimson v. Kerby*, 7 Grant Ch. 510 (excess interest held recoverable); *Deal v. Martin*, 1 Phila. 106 (held money exacted *colore officii* recoverable. Following *Dew v. Parsons*); Hutchinson, Carriers (2d ed.) pp. 513, 514, 515, 894 (to effect that excess freight charges may be recovered); *Close v. Phipps*, 7 Man. & G. 585 (money paid by mortgagor under threat of sale held recoverable. Following *Parker v. Railway Co.*); *Quinnett v. Washington*, 10 Mo. 53 (held that money paid to have goods restored which were illegally taken under distress for rent may be recovered); *Bexar B. & L. Ass'n v. Robinson* (Tex.) 14 S. W. 227 (usurious interest voluntarily paid held recoverable); Brantley, Law of Contracts (1893) pp. 281, 282 (excess freight rates recoverable); Comyn, Contracts (1831) pp. 338, 340, 344, 345, 358, 366, 367, 378, 379, 380 (on payments under compulsion); Powell, Contracts (1802) pp. 204 *et seq.* (on payments under compulsion); 1 Beach, Modern Law of Contracts (1896) sec. 664 (money paid under duress and excess freight charges may be recovered); Hammon, Contracts, p. 666 (payment under compulsion may be recovered); *American Brewing Co. v. City*, 187 Mo. 367, 86 S. W. 129 (1905) (holds money paid for water supply is under compulsion and can be recovered); *Cobb v. Munce*, 3 Australian Jurist, 46 (money received *colore officii* recoverable); *Lum v. McCarty*, 39 N. J. L. 287 (to the same effect); *Armitage v. Smith*, 4 Australian Jurist, 175 (money exacted under compulsion recoverable); *King v. Bannatyne*, 20 N. Z. L. R. 232 (money exacted *colore officii*).

See also, upon the subject in general, notes in 94 Am. St. Rep. 395; 30 Am. Law Reg. (N. S.) 641, and note to *Marriott v. Hampton*, 2 Sm. L. C. 1690.

*B.* Payments made to a public service corporation in excess of

the legal rate stand upon the same footing as an overcharge by a public official. Such overcharge can always be recovered back.

*Kenneth v. S. C. R. R. Co.* (S. C.) 15 Rich. Law, 284, was a suit against a common carrier to recover overcharges. The court, in referring to the restrictions on defendant's right to make the charges, said (p. 306): "The restrictions which are imposed are substantive and independent regulations of law defining their (the carrier's) powers, like the acts * * * prescribing the fees of public officers."

*Edmonds v. Abeel*, 20 Hun, 441, was an action to recover excess charges paid for ferriage. The court said: "As is said by the plaintiff's counsel, the taking of more than the legal rate of ferriage is in the nature of extortion, or like the taking of illegal fees by public officers, because the defendant was conducting a public franchise. The plaintiff had a right to cross, on paying the legal toll. To take more than that, against the plaintiff's will, must make the party who takes the money liable to refund."

In 2 Wharton, Contracts (1882) sec. 738, it is said: "A common carrier is regarded as so far a public officer that excessive payments extorted by him can be recovered back in an action for money had and received, and this is eminently the case with railway companies when imposing unequal and extortionate charges."

In Keener, Quasi Contracts, p. 426, the author says: "Money paid to one, who, because of his position, is under an obligation to discharge certain duties to the public, but who refuses to discharge such duties without the payment of a sum of money to which he is not entitled, can be recovered as money paid under compulsion." The author then refers to *Steele v. Williams*, 8 Exch. 625 (overcharge by a parish clerk), and to *Dew v. Parsons*, 2 B. & A. 562 (overcharge by a sheriff), and says: "On the same principle it is held that a carrier who refuses to receive goods tendered to him unless a sum of money is paid to which he is not entitled must refund to the plaintiff the overpayment made in such circumstance." To the same effect is Leake, Contracts (4th ed., 1902) pp. 61, 62, *supra*.

In *American Steamship Co. v. Young*, 89 Pa. St. 186, the steamship company sued a United States shipping commissioner to recover $2 per head illegally collected from plaintiff by defendant for certain seamen employed by plaintiff. The court, in allowing a recovery, said (p. 191): "We think that sound public policy requires us to hold that a public officer who, *virtute officii*, demands and takes as fees for his services what is not authorized, or more than is allowed by law, should be compelled to make restitution. He and the public who have business to transact with him do not stand upon an equal footing. It is his special business to be conversant with the law under which he acts, and to know precisely how much

he is authorized to demand ror his services; but with them it is different. They have neither the time nor the opportunity of acquiring information necessary to enable them to know whether he is claiming too much or not; and, as a general rule relying on his honesty and integrity, they acquiesce in his demand." Citing cases.

In *Lewis v. City* (Cal.) 82 Pac. 1106, plaintiff, as executor of an estate, sought to file an inventory and appraisement. The clerk of the court refused to accept it until plaintiff paid a fee of $70 for so doing. Plaintiff paid and sued to recover back. The court held the payment involuntary on the ground that whenever a person is obliged to pay an illegal fee to a public officer in order to induce him to do his duty, a recovery may be had.

In *Cook County v. Fairbank*, 222 Ill. 578, it was held that money paid by executors to the probate clerk under protest to obtain letters testamentary, which he refused to issue until the same was paid to him as fees, may be recovered in an action of assumpsit, where the clerk had no legal right to the fees demanded.

In *Townshend v. Dyckman*, 2 E. D. Smith, 224, the defendant, who was the register of the city of New York, refused to permit the plaintiff to examine the mortgage indexes unless he paid a fee of five cents. Plaintiff paid the money and was allowed to recover it back.

In 22 Am. & Eng. Ency. of Law (2d ed.) p. 619, it is said: "The rule is well settled that a payment exacted by and paid to a public officer in excess of his legal fees in order to obtain the performance of his official duty, to which the payor is entitled without such payment, is compulsory, and may be recovered back, and in such case it is not necessary that the payor should have protested against the payment."

In *Britton v. Frink*, 3 How. Pr. Rep. 102, excessive costs were paid an attorney in settlement of a suit, and a recovery was allowed.

In *Steele v. Williams*, 8 Exch. 625 (a leading case), a parish clerk charged illegal fees for an examination of the parish register. The court said: "The law relating to voluntary payments has nothing to do with the case. The defendant was entitled to take certain specific fees and nothing more. The payment in this case was made without consideration, and it is an abuse of language to call it voluntary."

In *Dew v. Parsons*, 1 Chitty, 295, a recovery of excess fees paid to a sheriff was allowed.

In *Marcotte v. Allen*, 91 Me. 74, 39 Atl. 346, the city clerk, though paid fees for burial permits by the city, charged and collected similar fees from the plaintiff, an undertaker. The court allowed a recovery on the ground that the defendant was a public officer and because the parties were not on a level.

In *Robinson v. Ezzell*, 72 N. C. 231, the register of deeds exacted excessive fees for recording a chattel mortgage under a claim that property covered thereby required a charge as for recording a real estate mortgage. Plaintiff paid the excessive amount under protest. The court allowed a recovery. See also Wald's Pollock, Contracts (3d ed.) pp. 730–732. To the same effect see *Lovell v. Simpson*, 3 Esp. 153 (overcharge by sheriff); *Walker v. Ham*, 2 N. H. 238 (overcharge by sheriff); *Stevenson v. Mortimore*, Cowp. 805 (op. by Lord Mansfield); *Evans v. Funk*, 151 Ill. 650 (illegal fees accepted by a judge); *Barnes v..Foley*, 5 Burr. 2711 (overcharge by postmaster); *City of Chicago v. Sperbeck*, 69 Ill. App. 562 (illegal license fees); *Traherne v. Gardner*, 5 El. & Bl. 914 (illegal fees exacted by clerk of copyhold court); *Cartwright v. Rowley*, 2 Esp. 723 (monies paid stewart of a manor to produce deeds and court rolls at trial); Greenhood, Public Policy, p. 90; Story, Agency (9th ed.) sec. 307; 22 Am. & Eng. Ency. of Law (2d ed.) pp. 611, 619. See also cases cited under *A. supra*.

*C*. Where a charge is made in violation of a law intended to protect one set of persons against imposition or extortion by another, the amount so paid may be recovered back. The question of duress is not involved.

In *Evans v. Funk*, 151 Ill. 650, it was held that where a probate judge received a fee from a person interested in an estate as compensation for inducing the executor of such estate to make a compromise of a will contest, in violation of the statute, such payment could be recovered back. The plaintiff was ignorant of the statute at the time of the making of the payment.

In *Gray v. Roberts*, 2 Marsh. (Ky.) 208, plaintiff gave defendant notes for lottery tickets, and, having thereafter paid the notes, sued to recover back. The court of appeals of Kentucky, in holding that there could be a recovery, said: "Where the transaction is in violation of a law made for the protection of one party against acts of another, they are not equally guilty, and the innocent party, when he has paid money upon such a transaction, may, without doubt, recover it back."

In *Hall v. Kimmer*, 61 Mich. 269, an attorney charged an illegal fee in connection with the collection of a pension. In allowing a recovery back, the court said: "A charge beyond $10 is, under the law' against public policy and cannot be sustained. * * * The money taken beyond the amount allowed for such services by the agent may be recovered back by the pensioner as money received for his use."

In *Smart v. White*, 73 Me. 333, involving an illegal charge for procuring a pension, the court said: "The parties do not stand *in pari delicto*. * * * The punishment is to be inflicted upon the taker and not upon the giver. She (plaintiff) is to be protected, not

punished. Her ignorance of the law or her folly, if not ignorance of it, is excusable. But his is not. He commits the wrong, she does not. She cannot defraud herself. The statute would be nullified by a different interpretation. * * * If the plaintiff assented to the payment under and by force of the contract (which she theretofore entered into with defendant) because she was mistaken as to her legal rights, and did not know of the protection vouchsafed to her by the statute, she was defrauded."

In *Thomas v. City of Richmond*, 12 Wall. 349, the supreme court of the United States said: "Lord Mansfield, in *Smith v. Bromley*, 2 Doug. 696, as long ago as 1760, laid down the doctrine, which has ever since been followed, in these words: 'If the act be itself immoral or the violation of the general rule of public policy, both parties are *in pari delicto*, but when the law violated is calculated for the protection of the subject against oppression, extortion and deceit, and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover.'" Smith, Contracts (6th ed.) p. 274, is to the same effect.

In *Smith v. Bromley*, 2 Doug. 696, plaintiff's brother having committed an act of bankruptcy, plaintiff paid defendant for signing the bankrupt's certificate, and sued to recover back such payment. In holding that the action would lie, Lord Mansfield said: "There are * * * laws which are calculated for the protection of the subject against oppression, extortion, deceit, etc. If such laws are violated and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover." *Atkinson v. Denby*, 6 H. & N. 778, is to the same effect.

In *Barnes v. Foley*, 5 Burr. 2711, it was held (opinions by Mansfield, Aston and Willes) that an action for money had and received would lie against a postmaster who had exacted fees for making personal deliveries of letters, where such fees were not permitted by an act of parliament.

In *Southern Railway Co. v. Machine Co.*, 135 Ala. 315, 33 So. 274, a recovery was allowed because the exaction of freight rates involved was in excess of the statute, and consequently extortionate.

In *Rice v. Railway Co.*, 122 Mich. 677, 81 N. W. 927, a street railroad charged excessive fare. A recovery was allowed because the ordinance was violated.

In *Pingree v. Mutual Gas Company*, 107 Mich. 156, 65 N. W. 6, a recovery was allowed for a charge for gas in excess of rates fixed by ordinance. To the same effect are: 1 Comyn's Dig., p. 185; Stephens' Nisi Prius (ed. 1844) p. 335; 1 Selwyn's Nisi Prius (7th Am. ed.) pp. 88, 90; *Williams v. Headley*, 8 East, 378; *Great Southern & West. Ry. Co. v. Robertson*, 2 L. R. Ireland, 548, *supra;* Endlich, Building Ass'n (2d ed.) sec. 369; *Bates v. N. Y. Ins. Co.*, 3 Johns. Cas. *238; 2 Greenleaf, Evidence (16th ed.) sec. 121; *Directors, etc.*

of *Great Western R. Co. v. Sutton*, L. R. 4 Eng. & Irish App. Cas, 226.

CONTRA CASES. *A.* In discussing the cases which are cited as holding a *contra* doctrine, a distinction must be noted with respect to cases in which public service corporations have charged more than "reasonable rates" for a service, such rates not being fixed by charter or statute. The leading case of this character is *Killmer v. N. Y. Central R. Co.*, 100 N. Y. 395. There the plaintiff made almost daily shipments of milk for thirteen years over the defendant's railroad without agreement as to the rates and without any complaint that the charge was excessive. Suit was brought to recover an excess over what was claimed to be a reasonable charge. The court denied a recovery, saying: "What is a reasonable sum for transportation of goods on the great railroad lines of the country in a given case is often a complex question, into which enters many elements and considerations, and is incapable of exact solution. * * * The common-law duty does not preclude special contracts between railroad corporations and shippers regulating the freight charge; and where, as in this case, the freight had been carried for a long course of years at schedule price, the shipper making no objection and no inquiry as to the reasonableness of the charge, and when it was his interest to object if the charge was unreasonable, he must, we think, be deemed to have assented to the charge as reasonable, and to have voluntarily waived any objection thereto. At least the receipt by the company of the freight at the tariff rate under such circumstances has no element of extortion."

After thus stating the reasons for refusing a recovery in that class of cases and after referring to certain English cases in which recoveries were allowed, the court distinguished them by saying (p. 402): "In these cases there was a violation of a specific statutory duty on the part of the railroad corporation."

The same distinction was also recognized in *Langdon v. Railroad Co.*, 9 N. Y. S. 245. There an action was brought in New York based on a Pennsylvania statute which prohibited a railroad from charging one shipper more than another. The court pointed out the difference between the allegations necessary to enable a recovery in each class of cases, and distinguished the Killmer case on the ground that the rates were not fixed by statute.

In *Armour Packing Co. v. Edison Electric Illuminating Co.*, 100 N. Y. S. 605, 609, plaintiff sued to recover back moneys paid defendant for electricity for lighting purposes in excess of sums charged to others for similar services. The court distinguished the Killmer case, and said: "There the plaintiff based his claim entirely upon an excessive and unreasonable charge and it was not at all founded on the theory of an unjust discrimination."

In *Pingree v. Mutual Gas Co.*, 107 Mich. 156, 65 N. W. 6 (1895)

*supra*, the court said: "A distinction may well be made between cases depending upon the common-law duty to carry goods at a reasonable compensation and those where, by the statute, the rate is fixed by comparison, or discrimination is prohibited. In the latter class of cases the facts are peculiarly within the knowledge of the company fixing the rate, and the presumption indulged by the party making the payment would naturally be that the statute was being complied with. * * * In *Killmer v. Railroad Co.*, 100 N. Y. 395, there was no statute fixing the rate, or rendering the charges unlawful. * * * The court in that case distinguished it from the cases arising under charter clauses or statutes prohibiting discrimination or fixing rates."

In *Salt River Valley Canal Co. v. Nelssen* (Ariz.) 85 Pac. 117, suit was brought to enjoin a public water company from charging excessive rates and to recover back excess rates. The court said: "It is clear in reason and is well settled by precedents that where statutes prescribe maximum rates, one from whom a rate has been exacted in excess of the legal maximum may sue for the excess." See also *Directors, etc. Great Western Ry. Co. v. Sutton*, L. R. 4 Eng. & Irish App. Cases, 226; *Hilton Lumber Co. v. Atlantic Coast R. Line* (N. C.) 53 S. E. 823; *Great Southern & Western Ry. Co. v. Robertson*, 2 L. R. Ireland, 548.

In *Potomac Coal Co. v. C. & P. R. R. Co.*, 38 Md. 226, plaintiff sued to recover monies exacted by the defendant for freight in excess of the rates charged other persons. A recovery was denied on the ground that the money was voluntarily paid. The excess rates were not prohibited by statute. The case was cited, but not followed, in the following cases: *Pingree v. Mutual Gas Co.*, 107 Mich. 156, 65 N. W. 6; *W. Va. Transp. Co. v. Sweetzer*, 25 W. Va. 434, 462; *Railway Co. v. Steiner*, 61 Ala. 559.

In *Monongahela Navigation Co. v. Wood*, 194 Pa. 47, an action was brought to recover back freight monies paid in excess of a reasonable rate. A recovery was denied.

The following cases can also be classed as "reasonable rate" cases or as cases in which no statutory rate was involved: *Strough v. Railroad Co.*, 87 N. Y. S. 30, 92 App. Div. 584; *Bernhardt v. C. & N. W. R. Co.*, 135 N. C. 258, 47 S. E. 427. See also 2 Rapalje & Mack's Digest of Railway Law, 630, where the cases are classified.

B. CONTRA CASES INVOLVING STATUTORY RATES.

In *Kenneth v. Railroad Co.*, 15 Rich. Law, 284, 98 Am. Dec. 382, it was held no action would lie to recover freight charges in excess of the legal rate, the payment having been made after the goods had been carried and delivered, and without objection, protest or notice of discontent.

In *Arnold v. Railroad Co.*, 50 Ga. 304, the plaintiff sued to recover an overcharge for the carriage of certain cotton. It was claimed

that the rates charged were in excess of the rates allowed in the company's charter, which was of doubtful construction. The court held that the payments were made under mistake of law and could not be recovered back. The case is cited, but not followed, in the following cases: *Pingree v. Mutual Gas Co.*, 107 Mich. 156, 65 N. W. 6; *Railroad Co. v. Wilson*, 132 Ind. 517, 32 N. E. 311.